# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

RUTH A. DEVER,                 )
          Plaintiff,        )
                        )
    v.                      )        CASE NO.: 3:12-CV-279 JVB
                        )
CAROLYN W. COLVIN,        )
Acting Commissioner of Social Security,[1] )
         Defendant.     )

## OPINION AND ORDER

Plaintiff Ruth Dever seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2). Plaintiff asks the Court to reverse the Commissioner's decision and award benefits, or in the alternative, remand the decision for further proceedings. For the following reasons, the Court grants Plaintiff's request for remand.

## A. Procedural Background

On August 25, 2010, Plaintiff applied for DIB alleging that she became disabled on August 19, 2008, due to a number of physical and mental impairments, including coronary artery disease, degenerative disc disease and arthritis of the lumbar spine, circulation problems, sleep apnea, asthma, irritable bowel syndrome, agoraphobia, panic disorder, anxiety, and depression. (R. 65, 103-05.) Her application was initially denied on November 17, 2010, as was her request for reconsideration on January 27, 2011. (R. 56-59, 63-65.)

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is automatically substituted for Michael J. Astrue as the named Defendant.

On November 29, 2011, Administrative Law Judge ("ALJ") Laurel Greene held a hearing at which Plaintiff, Plaintiff's husband, and a vocational expert testified. (R. 30-53.) Thereafter, on December 6, 2011, the ALJ issued a decision finding Plaintiff not disabled and denying her DIB claim. (R. 12-24.) In denying Plaintiff's claim, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since August 19, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine and chronic obstructive pulmonary disease . . . (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record . . . the claimant can lift 20 pounds occasionally and 10 pounds frequently, she can stand and/or walk for up to 6 hours, and sit for up to 6 hours in an 8 hour work period. The claimant can never climb ladders, ropes, or scaffolds, but she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and/or crawl. The claimant must also avoid concentrated exposure to extreme temperatures, humidity, dusts, fumes, gases, and odors.

6. The claimant is capable of performing past relevant work as a cafeteria attendant (DOT #311.677-010), and a waitress (DOT #311.477-030). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from August 19, 2008, through the date of this decision (20 CFR 404.1520(f)).

*Id.*

On April 12, 2012, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-3.) Plaintiff now requests judicial review of the ALJ's December 6, 2011, decision denying her DIB claim.

## B. Factual Background

### (1) *Overview of Medical Evidence*

(a) *Back Impairment*

Beginning in April 2007, Dr. Ajit Pai, a pain management specialist, treated Plaintiff for complaints of lower back pain. (R. 320.) Dr. Pai documented Plaintiff's history of chronic lower back pain and noted that prior epidural steroid injections provided her with "good pain relief." *Id.* A CT scan and x-ray evaluation indicated "advanced osteoarthritis with degenerative lumbar disc disease," which was more significant at the L5-S1 level. *Id.* Dr. Pai's examination showed that Plaintiff had moderate tenderness in the lumbar axial and bilateral lumbar paravertebral area. *Id.* Dr. Pai diagnosed degenerative lumbar disc disease, recurrent lower back pain, and bilateral lumbar radiculopathy. *Id.* He recommended Plaintiff have an epidural steroid injection and prescribed Lortab (narcotic pain medication) and Soma (muscle relaxant medication). (R. 321.)

Dr. Pai treated Plaintiff for back pain on six more occasions in 2007. Initially, in April 2007, Plaintiff reported that a recent epidural steroid injection provided significant pain relief and, in May 2007, she stated her pain had improved by 60 to 70 percent. (R. 316, 318.) Four months later, in September 2007, Plaintiff complained of severe lower back pain and Dr. Pai's examination indicated she had moderate to severe tenderness in the lumbar axial area at the L5-S1 level. (R. 314.) Her straight leg raising test was mildly positive in both legs. *Id.* At her follow-up appointments in

October, November, and December 2007, Dr. Pai noted Plaintiff needed monthly treatment for pain control and again prescribed Lortab and Soma. (R. 311-13.)

In 2008 and 2009, Plaintiff continued to complain of lower back pain. In June 2008, Dr. Pai noted moderate tenderness in the lumbar axial and bilateral lumbar paravertebral area and mild positive straight leg raising in both legs. (R. 308.) He administered a L5-S1 interlaminar epidural steroid injection and prescribed oral pain medication even though Plaintiff had some improvement from the injection. (R. 307, 308.) In March 2009, Dr. Pai's examination indicated moderate tenderness in the thoracolumbar axial area and he administered a left-sided T12-L1 epidural steroid injection. (R. 304.)

Dr. Pai continued to treat Plaintiff for chronic back pain in 2010. In February and March 2010, Dr. Pai noted Plaintiff had tenderness in her lumbar spine, displayed an antalgic gait, and rated her pain as an eight on a scale of one to 10, with 10 being the worst pain. (R. 567, 569, 576.) Then, in August 2010, Plaintiff experienced uncontrollable pain in her lumbosacral spine, which was aggravated by standing and walking and caused numbness, tingling, and weakness in her legs. (R. 563-64.) Her examination indicated she had severe tenderness in the right lumbar paravertebral area, an antalgic gait, and positive straight leg raising on the right. (R. 564.) As a result of these findings, Dr. Pai administered a lumbar epidural steroid injection. (R. 564-65.) In a December 2010 letter, Dr. Pai detailed Plaintiff's history of chronic back pain noting an x-ray evaluation of the lumbar spine showed lumbar facet arthritis at the L4-L5 and L5-S1 levels with "chronic disc disease with narrowing and spondylosis more significant at the L5-S1 level." (R. 561.) Dr. Pai opined Plaintiff is probably "not a good candidate for a regular 8-hour workday because of her pain." (R. 561-62.)

In 2011, Plaintiff reported to Dr. Pai that her back pain was worsening and sitting aggravated her pain but standing helped to alleviate the pain. (R. 645-46.) An examination again showed she had moderate tenderness in her lumbar spine, an antalgic gait, and positive straight leg raising in both legs. (R. 646.) At the end of 2011, Dr. Pai wrote a second letter once again opining that Plaintiff was still "not a good candidate for a regular 8-hour workday because of her chronic back and leg pain" and she "is probably going to need pain management on a regular basis with Lortab as well as [S]oma." (R. 648.)

(b) *Chronic Obstructive Pulmonary Disease*

From July 2007 to August 2011, the same period she saw Dr. Pai for chronic back pain, Plaintiff was also treated for chronic obstructive pulmonary disease ("COPD"). During this time, Plaintiff complained of shortness of breath, difficulty swallowing, chest pain, numerous fevers, headaches, and chronic, productive coughs. (R. 333, 343, 346, 355, 358, 615, 621, 624.) A number of physicians diagnosed her with a history of cigarette smoking, emphysema, heart disease (including quintuple bypass surgery), hypertension, multiple upper respiratory infections, and exacerbations of her COPD, with one acute episode. (R. 334, 346, 358, 616, 620, 625.) Plaintiff was prescribed antibiotics and steroids for her COPD, and Chantix to help her stop smoking. (R. 334, 335, 343, 346, 616, 620, 625.) Additionally, she was diagnosed with venous insufficiency as a result of leg swelling and had a cardiac catherterization because of chest pain, which indicated "very good coronary circulation from her grafts." (R. 295.)

(c) *Mental Impairments*

Plaintiff was also treated for a number of mental impairments. From October 2006 to February 2010, Dr. Salvador Ceniceros, a psychiatrist, treated Plaintiff for agoraphobia, attention deficit hyperactivity disorder ("ADHD"), and depression. (R. 485, 594-606.) He prescribed a number of medication for these disorders, including Adderall for ADHD and Xanax for anxiety. (R. 594-606.) During this period, Plaintiff underwent a number of mental status examinations, which produced normal results. *Id.* Dr. Ceniceros ultimately assessed Plaintiff with a Global Assessment of Functioning ("GAF") score of 60, indicating she would have moderate difficulty in social and occupational functioning.[2] (R. 592.)

In June 2010, Dr. Josh Matthew, a second psychiatrist, conducted a psychiatric evaluation of Plaintiff. At that time, Plaintiff reported to Dr. Matthew that her panic attacks were often associated with shortness of breath, cognitive clouding, dizziness, and feeling "clammy." (R. 485.) She described having panic attacks when she goes to the store and explained that if she does not think about it, she can run into the store and get what she needs, but if she thinks about going to the store she becomes "very nervous." *Id.* Plaintiff explained she is also afraid of crowds and "avoids going out and frequently stays in the house." *Id.* Her ability to concentrate is "okay" on her current Adderall dosage, but she has a "history of being forgetful and disorganized." *Id.*

Plaintiff's mental status examination showed her thought processes were sequential and her memory was intact for recent and remote events. (R. 487.) Her affect was predominantly anxious

---

[2] The GAF includes a scale ranging from zero to 100, and is a measure of an individual's "psychological, social, and occupational functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Tex. Rev. 2000) ("DSM–IV–TR"). A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

but there was no evidence of "internal distractibility, guardedness, or paranoia." *Id.* Dr. Matthew diagnosed Plaintiff with panic disorder with agoraphobia, ADHD, dysthymic disorder, amphetamine dependence in sustained remission, and a GAF score of 60. (R. 488.) He recommended Plaintiff participate in individual therapy and reduced her medication. *Id.*

In August 2010, Plaintiff reported she was having difficulty with her medication levels. (R. 506-07.) She appeared anxious with poor concentration and was assessed with a GAF score of 58. *Id.* Next, in September 2010, Plaintiff requested an increase in her medication because the lower dose caused her to be almost homebound. (R. 499, 501-02.) In October 2010, she was assessed with being non-compliant with her medication after being given a random drug test. (R. 496.) Plaintiff denied medication seeking behavior and agreed to taper off of some of her medication. (R. 497.) But in November 2010, she again reported having difficulty on a lower dose of Adderall and requested additional medication. (R. 491.) Plaintiff was referred to an addiction program as a result of her perceived dependence on amphetamines. *Id.*

(d) *Evaluations By State Agency Physicians*

Plaintiff's physical and mental impairments were evaluated by a number of state agency physicians in October and November 2010. At the beginning of October 2010, Dr. Carol Singler, Ph.D., a licensed psychologist for the Disability Determination Bureau ("DDB"), conducted a consultative evaluation of Plaintiff. (R. 453-56.) Plaintiff reported to Dr. Singler that she "had a long standing problem" with ADHD, panic agoraphobia, anxiety, and depression. (R. 453, 454.) She had a number of surgeries, including open heart surgery and was diagnosed with COPD a few years earlier. (R. 454.) Plaintiff took 16 different medications and explained that her attention and

concentration were "good" when she took Adderall.  *Id.*  Dr. Singler administered a mental status examination and concluded Plaintiff met the criteria for diagnoses of dysthymic disorder and phase of life problem.  (R. 455-56.)  She assessed Plaintiff as having a GAF score of 61, which was indicative of mild difficulties in social and occupational functioning.[3]  (R. 455.)

Toward the end of October 2010, Dr. F. Kladder, Ph.D., a state agency psychologist, reviewed Plaintiff's medical file and assessed her mental ability to perform work-related activities. (R. 458-71.)  He determined that Plaintiff's mental impairments were non-severe and diagnosed her with ADHD and dysthymic disorder.  (R. 458, 459, 461.)  Dr. Kladder viewed Plaintiff as having mild restrictions in her activities of daily living as well as mild difficulties in maintaining social functioning.  (R. 468.)  He indicated Plaintiff was "generally functioning pretty well" because she was able to engage in daily activities and her problems with memory, attention, and concentration were controlled by medication.  (R. 470.)  A state agency consultant also concurred with Dr. Kladder's assessment.  (R. 584.)

Dr. Crystal Strong, a licensed physician for the DDB, also conducted a consultative evaluation in October 2010.  (R. 472-78.)  Plaintiff reported to Dr. Strong that she had chest pain twice a month, which was brought on by stress and fatigue.  (R. 473.)  She used a CPAP machine for her sleep apnea and had lower back pain radiating to her mid-section, which worsened when she sat or stood.  (R. 473-74.)  Epidural steroid injections helped Plaintiff's back pain but she could no longer afford the injections and her prescription pain medication only helped "a little."  (R. 474-75.) Plaintiff had anxiety and panic attacks when she was around crowds of people and had four to five

---

[3] A GAF score of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34.

attacks per week. (R. 474.) She estimated she could stand for 20 minutes at a time and for a total of four hours in an eight-hour workday. *Id.* Plaintiff could walk or sit for 10 minutes, lift 10 pounds and drive for 30 minutes. *Id.* She had a 35-year history of smoking and took 17 different medications. (R. 475.)

Dr. Strong's examination indicated Plaintiff had a normal range of motion but she had tenderness in her lower lumbar region. (R. 476.) A pulmonary function test indicated a moderately severe obstruction, which significantly improved with medication and was suggestive of a reactive airway asthmatic type of disease. *Id.* Dr. Strong assessed Plaintiff with emphysema and anginal chest pain and opined she should not work at an exertional level higher than that cleared by her cardiologist. (R. 476-77.) Regarding Plaintiff's back pain, Dr. Strong opined that Plaintiff should limit any lifting of over 20 to 25 pounds to less than half of her workday and she should have an active job which combines standing, sitting, walking, and some degree of lifting. (R. 477.) Furthermore, in November 2010, Dr. M. Ruiz, a state agency physician, reviewed Plaintiff's medical file and opined she could perform light work but she had certain postural and environmental restrictions. (R. 517, 518, 520.)

**(2)** *Plaintiff's Testimony*

At the hearing, Plaintiff testified she completed the eleventh grade and previously held jobs as a cafeteria attendant, laundry laborer, and waitress. (R. 34-36.) These jobs typically required Plaintiff to be on her feet most of the time and also lift over 10 pounds. (R. 34-36, 41.) She characterized her back, hip, and leg pain as being severe enough to keep her from working. (R. 39.) Plaintiff described her lower back pain as a dull aching pain that traveled down her legs. (R. 45.)

She explained that epidural steroid injections helped her back pain but she could no longer afford the injections because she did not have health insurance. (R. 42-43.) Plaintiff also described debilitating panic attacks when she was around crowds of people, which caused her to pass out. (R. 37-38.) Plaintiff further indicated she reduced her daily smoking by cutting down to less than a pack of cigarettes a day. (R. 39, 43.)

Plaintiff next testified about her limitations in standing, sitting, and walking. She explained she could stand for about 45 minutes to an hour at a time and for a total of four and one-half hours in an eight-hour workday. (R. 40, 43, 44.) Plaintiff was only able to walk a block at one time. (R. 40.) She had difficulty sitting because she had surgery on her hip to remove an ulcer and she must alternate between standing and sitting to alleviate the pain. (R. 39-40, 44.) After an hour, Plaintiff must alternate between positions by either standing up or sitting down. (R. 40.) Plaintiff estimated she could sit for an hour and fifteen or twenty minutes at a time and for a total of more than half of an eight-hour workday. (R. 43.) However, she typically sits for about three and one-half hours each day and stands the rest of the day. (R. 45.) Plaintiff stood more than she sat because her hips feel better when she stood but she gets "too tired" from standing. *Id.*

With regard to her daily activities, Plaintiff was able to cook, clean, and do laundry, but she could only do household chores for about 40 to 45 minutes before she would need to sit down. (R. 37, 46.) She was not able to grocery shop because she could not go into stores where there were crowds of people. (R. 37, 38.) Plaintiff watched television and got along with her family but did not engage in outside activities. (R. 38.) She was not able to drive and last drove about six or seven months before the hearing. (R. 46.)

### (3) *Plaintiff's Husband's Testimony*

Elmer Dever, Plaintiff's husband, testified about the severity of Plaintiff's impairments and their impact on her ability to function on a daily basis. (R. 47-48.) Dever first explained that Plaintiff frequently complained she did not feel well and her back hurt. (R. 47.) He testified that Plaintiff's "mind wanders when doing different things" and she will "start something . . . and stop and sit and start back doing something else." (R. 47-48.) Dever further indicated Plaintiff had difficulty sitting, standing, and walking for extended periods of time, she sat more than she stood, and she could only engage in activities for about 15 or 20 minutes at a time. *Id.*

### (4) *Vocational Expert's Testimony*

Richard Fisher, a vocational expert, testified that Plaintiff's past work as a cafeteria attendant and waitress constituted light-level work and her work as a laundry laborer was medium-level work. (R. 49-50.) The ALJ then posed two hypothetical questions to Fisher to determine if there were any jobs Plaintiff could perform. (R. 50-51.) The first hypothetical required Fisher to assume an individual with Plaintiff's age, education, and past work experience who had the residual functional capacity ("RFC") to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and had certain postural and environmental restrictions. (R. 50.) On the basis of these limitations, Fisher stated Plaintiff could perform her past work as a cafeteria attendant and waitress, as defined by both the Selected Characteristics of Occupations ("SCO") publication (a companion volume to the Dictionary of Occupational Titles), and as performed. (R. 50-51.) The ALJ posed a second hypothetical in which she asked Fisher if there would be any jobs available if the hypothetical individual could

occasionally interact with supervisors, co-workers, and the general public but could not adhere to a regular work schedule and meet reasonable production goals because of chronic pain. (R. 51.) Fisher testified that all past work would be eliminated because of the individual's inability to sustain a regular work schedule. *Id.*

Plaintiff's attorney then questioned Fisher and asked him if the waitress job, as performed, allowed for an individual to sit for two hours in an eight-hour workday. (R. 51.) In response, Fisher described his prior experience as a waiter and stated the job did not require him to stand continuously for six hours at a time. *Id.* He explained that "generally a lunch or a dinner shift is four hours" and he did not think the job required continuous standing or walking without a substantial break after about four hours. (R. 52.) Fisher stated the waitress and cafeteria attendant jobs allowed for sitting two hours during an eight-hour workday, which is consistent with the SCO. *Id.*

## C.  Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one: the Court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court may not reevaluate the facts, reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether a plaintiff is disabled, the Commissioner has the

responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, and the error is not harmless, the Court must reverse the decision regardless of the evidence supporting the factual findings. *Id.*

While the standard of review is deferential, the Court "must do more than merely rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citations omitted). In order for the Court to affirm a denial of benefits, the ALJ must have articulated the reasons for the decision at "some minimal level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from the evidence to [the] conclusion." *Id.* Although an ALJ need not address every piece of evidence, the ALJ cannot limit her decision to only that evidence which supports her ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the Court to assess the validity of her findings and afford the plaintiff meaningful judicial review. *Scott*, 297 F.3d at 595.

## D. Five-Step Inquiry

To qualify for DIB under Title II, a claimant must establish that she has a disability within the meaning of the Act. 42 U.S.C. § 423(a)(1)(D). An individual is "disabled" if she has an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations set forth a

five-step sequential inquiry for determining whether a claimant is disabled. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted).

An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant—in light of her age, education, job experience and RFC to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

**E. Analysis**

Plaintiff challenges a number of aspects of the ALJ's decision. She argues that the ALJ failed to properly evaluate and weigh the opinions of her treating physician, Dr. Pai. Plaintiff next claims the ALJ's RFC finding is flawed because the ALJ did not consider the severity of her COPD and failed to discuss Dr. Matthew's records, which document her diagnosis of ADHD and related treatment for that condition. She further claims the RFC finding is improper because the ALJ did

not include her limitations stemming from her anxiety and panic attacks. Furthermore, Plaintiff contends the ALJ erred at step five by finding she could return to her past work as a waitress because the job as she performed it was inconsistent with Fisher's testimony and the SCO. The Court now considers each of the asserted grounds for remand.

**(1) *Treating Physician Issue***

Plaintiff claims the ALJ misapplied the treating physician rule when she gave "little weight" to Dr. Pai's opinions that she was not capable of sustaining full-time work. (Pl.'s Mem. at 20-22.) She argues the ALJ initially erred by finding that Dr. Pai's December 2010 and November 2011 opinions were inconsistent with the record evidence. *Id.* at 20-21. Next, Plaintiff asserts the ALJ improperly discredited Dr. Pai's opinions by relying on gaps in her treatment history and citing to instances of her non-compliance with prescribed treatment. *Id.* at 21. She further argues that the ALJ's reliance on the state agency physicians' opinions was misplaced because the physicians did not have an opportunity to review Dr. Pai's diagnoses, examination findings, and treatment records before they assessed Plaintiff's ability to work. (Pl.'s Reply at 3.)

The Commissioner defends the ALJ contending she properly evaluated Dr. Pai's conclusory opinions and found they were not entitled to controlling weight because they contrasted with other medical evidence. (Def.'s Mem. at 7.) The Commissioner next points out that the ALJ's decision is supported by the opinions of the state agency physicians, who unlike Dr. Pai, reviewed all of the record evidence. *Id.* at 7-8. Thus, the Commissioner avers the ALJ reasonably rejected Dr. Pai's opinions and appropriately relied on consultative physician Dr. Strong's findings that Plaintiff did not have any restrictions in her ability to sit, stand, and walk. *Id.* at 8.

An ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) it "is not inconsistent with the other substantial evidence" in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). This rule takes into account the advantage the treating physician has in personally examining the claimant, while controlling any bias the treating physician may develop, such as a friendship with the patient. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). On the other hand, if well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight. *Id.* at 376. At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." *Id.* at 377. An ALJ must offer "good reasons" for discounting the opinion of a treating physician. *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011).

Whether the ALJ articulated good reasons for rejecting Dr. Pai's December 2010 and November 2011 opinions is somewhat of a close call, but one the Court resolves in Plaintiff's favor. First, contrary to the ALJ's finding that Dr. Pai's opinions contrasted sharply with the record evidence, this Court's review of the record establishes that Dr. Pai's opinions are consistent with the record as a whole. Dr. Pai's treatment notes document Plaintiff's history of recurrent lower back pain as well as diagnoses of advanced osteoarthritis, degenerative lumbar disc disease, and bilateral lumbar radiculopathy. (R. 320.) His treatment records confirm multiple examination findings of moderate to severe tenderness of the lumbar spine, an antalgic gait, and positive straight leg raising. (*See e.g.*, R. 304, 308, 314, 564, 567, 569, 576, 646.) As further documented by Dr. Pai, Plaintiff often required epidural steroid injections and narcotic pain medication for her symptoms. (*See e.g.*,

R. 304, 307, 308, 311-13, 321, 564-65.)  Accordingly, Dr. Pai's diagnoses, findings, and treatment provide adequate support for his two opinions and are consistent with the record evidence.

The ALJ next rejected Dr. Pai's opinions because she was unable to reconcile what she believed were inconsistencies in closely dated medical records.  (R. 21.)  The ALJ explained that, while Dr. Pai's examinations indicated Plaintiff suffered from severe tenderness in her lumbar spine and had an antalgic gait, other medical records from the same time period did not mention these findings and specifically noted Plaintiff's gait was normal.  *Id.*  Here, the ALJ failed to identify the records she believes illustrate inconsistencies in the medical findings.  However, if the ALJ is referring to Plaintiff's medical records related to her COPD, ADHD, anxiety and panic attacks, or other conditions, it seems unlikely that the physicians who treated her for these illnesses would also evaluate her back disorder.  Accordingly, the Court cannot assess the validity of the ALJ's finding because the ALJ did not provide sufficient information about the medical records to permit meaningful judicial review.  *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004).

The ALJ also discredited Dr. Pai's opinions because Plaintiff had gaps in her treatment history with Dr. Pai and she had not been compliant with her treatment.  (R. 19, 21.)  But here Plaintiff's gaps in her treatment history are well-documented by Dr. Pai in his December 2010 and November 2011 opinions.  Dr. Pai explained that, while he began treating Plaintiff in April 2007, more recently, she had not been treated on a regular basis because she lost her health insurance.  (R 561, 648.)  Plaintiff also testified that she could not afford epidural steroid injections since she did not have insurance coverage.  (R. 42-43.)  Furthermore, Dr. Strong noted in her consultative report that Plaintiff was "not able to really afford [epidural steroid injections]" and "it [wa]s questionable as to how long" Plaintiff could continue the injections.  (R. 477.)  Thus, it was improper for the ALJ

to rely on perceived gaps in Plaintiff's treatment history as a basis for discrediting Dr. Pai's opinions. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (an ALJ "must not draw any inferences about a claimant's condition from [infrequent treatment or failure to follow a treatment plan] unless the ALJ has explored the claimant's explanations as to the lack of medical care.") (internal citation omitted).

While the Commissioner argues the ALJ appropriately relied on the opinions of the state agency physicians over those of Dr. Pai, this Court does not agree. Here, the Commissioner points out that the state agency physicians, unlike Dr. Pai, reviewed all of the medical evidence of record. However, the Court's review of the record establishes that the state agency physicians did not have the benefit of reviewing Dr. Pai's diagnoses, examination findings, and treatment records before they rendered their opinions because the Social Security Administration ("SSA") never received Dr. Pai's report.[4] The Commissioner next avers that the ALJ reasonably relied on consultative physician Dr. Strong's findings that Plaintiff did not have any limitations in her ability to sit, stand, and walk. (R. 477.) But Dr. Strong's assessment was based on a one-time consultative evaluation and, as stated, she did not have the benefit of reviewing Dr. Pai's records prior to her evaluation. (R. 59, 65, 476.) *See* 20 C.F.R. § 404.1517 (when the SSA "arrange[s] for [a consultative] examination or test . . . the examiner [will be given] any necessary background information about [a claimant's] condition"). Dr. Ruiz, another state agency physician, also reviewed the record and assessed Plaintiff's RFC largely on what seems to be Dr. Strong's consultative evaluation. (R. 516-23.)

---

[4] On November 17, 2010, the SSA denied Plaintiff's initial application for disability benefits. (R. 56-59.) The denial letter listed the medical records used to evaluate Plaintiff's claim and expressly noted that the SSA had not received Dr. Pai's report. (R. 59.) On January 27, 2011, Plaintiff's request for reconsideration was denied and that letter also indicated that the SSA had not received Dr. Pai's report. (R. 65.) Because the SSA did not receive Dr. Pai's report, that information was never considered by the state agency physicians.

Here, Drs. Strong's and Ruiz's assessments were based on an incomplete picture of Plaintiff's condition because Dr. Pai's report was missing from the record. Accordingly, the ALJ erred in giving greater weight to the opinions of the state agency physicians because they were not comprehensive and did not account for Dr. Pai's diagnoses, examination findings, and treatment. *See Moore v. Colvin*, No. 11 C 5412, 2013 WL 2897662, at *6-7 (N.D. Ill. June 12, 2013) (reversing where a consultative physician's and state agency reviewing physician's assessments were not based on a "sufficiently complete record of [the plaintiff's] condition" because neither physician reviewed any records from the plaintiff's treating psychiatrist when evaluating her mental impairments).

Even if the ALJ had articulated good reasons for refusing to give the opinions of Dr. Pai controlling weight, the ALJ still would have been required to determine what weight the assessment did merit. *See* 20 C.F.R. § 404.1527(c); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. *Moss v. Astrue,* 555 F.3d 555, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). But the ALJ never discussed these factors in assessing what weight to accord Dr. Pai's opinion. Here, many of the considerations seem to favor crediting the opinions of Dr. Pai: he is a pain management specialist; he saw Plaintiff on a regular basis, and the treatment relationship lasted for more than four years. Accordingly, the ALJ's failure to discuss these factors constitutes reversible error. *See Craft*, 539 F.3d at 676 (case

reversed in part because the ALJ failed to specifically explain the basis for the weight given to the treating physician's opinion).

Based on the shortcomings in the ALJ's consideration of Dr. Pai's opinions, the ALJ's decision lacks a basis for concluding that she applied the correct legal standard. In discounting Dr. Pai's opinions, the ALJ appears to have selected only those pieces of evidence that favored her ultimate conclusion. *Binion*, 108 F.3d at 788-89; *Herron*, 19 F.3d at 333. On remand, the ALJ shall reevaluate the weight accorded to Dr. Pai's opinions. If the ALJ cannot identify well-supported evidence contradicting these opinions, then the ALJ must give those opinions controlling weight. *See* 20 C.F.R. § 404.1527(c)(2). If good reasons do exist for discounting Dr. Pai's opinions, the ALJ must apply the factors listed in § 404.1527(c) when deciding what weight to give those opinions. Furthermore, on remand, the ALJ shall further develop the record to include the opinion of a state agency physician based on a review of Dr. Pai's diagnoses, examination findings, and treatment history.

**(2)** *RFC Issue*

Plaintiff contends the ALJ made a number of reversible errors in assessing her RFC. (Pl.'s Mem. at 19, 20, 22.) She claims the ALJ failed to consider the severity of her COPD and also erroneously found that she had not been diagnosed with ADHD. *Id.* at 19, 22. Plaintiff further alleges that the ALJ did not include her limitations stemming from her anxiety and panic attacks in her RFC assessment. *Id.* at 20.

The Commissioner, however, argues that the ALJ's RFC finding is supported by substantial evidence. The Commissioner first points out that there is insufficient evidence in the record to show

that Plaintiff's limitations from her COPD were greater than those found by the ALJ. (Def.'s Mem. at 8 n.2.) Next, the Commissioner contends that the ALJ's assessment of Plaintiff's mental impairments is supported by the opinions of a consultative psychologist and two state agency reviewing psychologists. *Id.* Thus, the Commissioner asserts Plaintiff has failed to produce evidence that shows she was significantly limited from a psychological standpoint. *Id.* at 8-9.

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; *see also* 20 C.F.R. § 404.1545(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence. *See* 20 C.F.R. § 404.1545(a)(3). According to the regulations:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7. Although an ALJ is not required to discuss every piece of evidence, she must consider all of the evidence that is relevant to the disability determination and provide enough analysis in her decision to permit meaningful judicial review. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Young*, 362 F.3d at 1002. In other words, the ALJ must build an "accurate and logical bridge from the evidence to [her] conclusion." *Scott*, 297 F.3d at 595 (citation omitted).

The Court agrees with Plaintiff that the ALJ made a number of reversible errors in assessing her RFC. First, the ALJ never discussed Dr. Strong's findings regarding Plaintiff's pulmonary function test results, which appeared to be near or below listing level (without medication). (R. 479.) *See* 20 C.F.R. § 404, Subpt. P, App. 1 § 3.02(A). These tests results coupled with Plaintiff's repeated bouts of upper respiratory infections, multiple exacerbations of her COPD, emergency room visits, and four-year treatment history indicate Plaintiff's COPD limitations are greater than those assessed by the ALJ. Next, the ALJ erroneously found that Plaintiff had neither been diagnosed with ADHD nor treated for that condition. (R. 17.) This Court's review of the record shows that Dr. Ceniceros diagnosed Plaintiff with ADHD, treated her for about a four-year period, and prescribed Adderall for her condition. (R. 485, 594-606.) After Dr. Ceniceros retired, Dr. Matthew also diagnosed Plaintiff with ADHD and prescribed Adderall. (R. 488.) But here the ALJ never discussed Dr. Ceniceros's and Dr. Matthew's diagnoses and treatment. The ALJ's lack of analysis here constitutes reversible error and precludes meaningful judicial review. *Clifford*, 227 F.3d at 870-71.

Importantly, the ALJ also failed to discuss Dr. Matthew's diagnosis of panic disorder with agoraphobia.[5] (R. 488.) Plaintiff testified she had anxiety and panic attacks, which were triggered by being around large crowds of people. (R. 37-38.) But the ALJ neither discussed this testimony nor Dr. Matthew's diagnosis that Plaintiff suffered from a panic disorder. Additionally, while the ALJ gave great weight to the opinions of the consultative psychologist and two state agency reviewing psychologists, those psychologists did not have the benefit of reviewing Dr. Matthew's

---

[5] The ALJ further failed to discuss Dr. Matthew's diagnoses of dysthymic disorder and his assessment that Plaintiff had moderate difficulties in social and occupational functioning on the basis of her GAF scores of 58 and 60. (R. 488, 506-07.)

records.[6] (R. 59, 65, 470.) Therefore, this Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of . . . missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

Accordingly, because the ALJ has not constructed an accurate and logical bridge between Plaintiff's impairments, supported by substantial evidence in the record, and the RFC assessment, a remand on this issue is warranted. *Clifford*, 227 F.3d at 871 (an ALJ must consider "*all* relevant evidence" and may not analyze only that information supporting the ALJ's final conclusion) (emphasis in original); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments . . . and may not dismiss a line of evidence contrary to the ruling.").

### (3) *Step Five Issue*

Finally, the Court does not need to reach Plaintiff's contention that the ALJ rendered an improper step five finding because the Court is remanding this case for errors in the ALJ's application of the treating physician rule as well as errors in her RFC finding. On remand, the ALJ must propound new hypothetical questions to the VE taking into account *all* of Plaintiff's limitations that are supported by the record evidence, *Indoranto v. Barnhart*, 374 F.3d 470, 470 (7th Cir. 2004), and verify that the VE's testimony is, in fact, reliable. *See Britton v. Astrue*, 521 F.3d 799, 803 (7th

---

[6] The November 17, 2010 letter denying Plaintiff's initial application for disability benefits expressly noted that the SSA had not received a report from the Oaklawn Psychiatric Center, the medical facility where Dr. Matthew worked. (R. 59.) The January 27, 2011 letter denying Plaintiff's reconsideration request also indicated that the SSA had not received a report from the Oaklawn Psychiatric Center. (R. 65.) Because the SSA did not receive a report from the Oaklaw Psychiatric Center, Dr. Matthew's treatment information (or information from other psychiatrists who may have treated Plaintiff at that facility) was never considered by the state agency psychologists.

Cir. 2008) (citing *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)) (noting that when an ALJ's finding is based on unreliable VE testimony, that finding is "equivalent to a finding that is not supported by substantial evidence and must be vacated").[7]


## CONCLUSION

For the foregoing reasons, the ALJ's decision and the Commissioner's subsequent denial of Plaintiff's DIB is reversed, and this case is remanded with instructions to return the matter to the Social Security Administration for further proceedings consistent with this Opinion.

SO ORDERED on September 23, 2013.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE

---

[7] In light of the ruling herein, the Court does not need to consider Plaintiff's argument that the ALJ should have used the Medical Vocational Guidelines in determining if she is disabled. (Pl.'s Mem. at 19.) If necessary, the ALJ will address that issue on remand.